UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

KEVIN E. WITCHER and
BOBBY BURNS

      Plaintiffs

                                      Civil Action No. 2:06-cv-00947

vs.

BAYER CROPSCIENCE LP,
Its agents, employees, and those
Acting in concert with Defendants,

      Defendant.

### _BAYER CROPSCIENCE LP MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT_

### _Facts_

Two Plaintiffs, Kevin Witcher ("Witcher") and Robert Burns ("Burns") have brought this action against Bayer CropScience LP ("BCS") alleging race discrimination in violation of Title VII.  Both men worked at the BCS site at Institute, WV.  Burns voluntarily executed a form to begin retirement on or about June 24, 2005. Deposition of Robert Burns, (hereinafter Exhibit A) at 39; Burns Deposition Exhibits (hereinafter Exhibit B) at 4.  Witcher remains employed.  He has suffered no loss of pay, no reduction in benefits and no other adverse employment action. Deposition of Kevin Witcher, (hereinafter Exhibit C) at 143.

While the Plaintiffs' allegations before the court include claims of a history of discrimination and harassment against each of them throughout their respective careers, the vast majority of such allegations were never included in their Complaints to the Equal Employment Opportunity Commission.  In his EEOC charge, Witcher alleged only that: 1) an e-mail referring

to "bad actors" used that term as a discriminatory reference to black employees, 2) his work had been "heavily scrutinized" and sabotaged, and 3) "management" had intentionally "falsified" his "work product."   Exhibit C at 67; Witcher Deposition Exhibits (hereinafter Exhibit D) at 7. Burns' claims focused almost entirely on his relationship with a co-worker named T. J. Hundley with whom he has had an ongoing conflict.   Burns claimed Hundley had used a racial slur and had "whistled Dixie" in his presence, and that he had been improperly disciplined for making a comment related to his conflicts with Hundley at a meeting in 2004.   Exhibit B at 6.

a)    *Plaintiff Witcher's claims*

      1.    *Use of the term "bad actors."*

Witcher works as an "I&E"; an instrument and electrical technician.   He (and others) is responsible for installing, repairing and maintaining various instruments, measurement devices, and electrical equipment used in the chemical production processes.   A variety of equipment used in the plant has required a high degree of maintenance and is prone to problems or failure. Mr. Gary Darkens, the manager responsible for the area, was charged with assuring proper operation of the unit in which Witcher worked.   In that connection, Darkens sent an e-mail titled "business update" to subordinates dated March 1, 2004.   Exhibit C at 108 – 109; Exhibit D at 8. In it, Darkens discussed a variety of business activities which were ongoing.   One of the focal points of the message was an opportunity to impress a customer that the Institute site was the best location at which a particular product could be produced.   He described the fact that foreign competition was priced lower, but that Institute could gain an advantage by demonstrating a "consistency of supply."

As part of that effort, Darkens cited the following need:

      Please do anything and everything to maximize our outputs
      Without jeopardizing EHSQ and continuously improving

> our efficiencies (both maintenance & operations.)  We have an Instrument/Electrical engineer on site now … to address the bad actors in the IE arena and must continue to aggressively improve our mechanical on stream time in addition to cycle time improvements….Exhibit D at 8

Though the e-mail was not sent directly to Witcher, he learned of it sometime after it was sent out.  Upon reading it, he concluded that the term "bad actors" was somehow meant as a reference to I&E mechanics.  Exhibit  C at 108 - 110.  Witcher never spoke directly with Darkens about the e-mail, however.  Exhibit C at 110.  When Darkens learned that his use of the term had somehow been perceived in that light, he issued a subsequent update (dated April 12, 2004) in which he specifically stated that the term "bad actors" was not intended to refer to any individual or group and that the term was one commonly used throughout industry to refer to troublesome equipment which adversely effected production.  Exhibit D at 9.[1]

Witcher never spoke directly with Darkens to understand the comment.  Despite the fact the term was never used in a derogatory context, was never directed at Witcher or any other person,  and Darkens clarified his statement after learning it had been misinterpreted, Witcher still contends the e-mail of March 1 was racially discriminatory.  Exhibit C at 108 – 110; Exhibit D at 7.

2) *Witcher's claims his work has come under unwarranted scrutiny and  was sabotaged.*

Mr. Witcher's assertion that his work has come under increasing scrutiny is correct in a sense. Many of the products produced at the Institute Site are also produced by competitors abroad.  Since some of the technology at Institute is less efficient than similar production units in other countries, the cost of producing agricultural chemicals at Institute is higher.  Adding to the

---

[1] Even a cursory "Google" search disclosed a wide variety of material using the term "bad actors" in exactly the context described by Darkens, and even located information regarding software programs which can be used to identify and track such equipment as well as seminars devoted to the management of the issue.  Exhibit D at 10

competitive disadvantage is the higher labor cost at Institute.  In response to global competitive pressures, the company developed a site wide "business case for change" and took that message to employees at Institute last year.  As a response to these global competitive pressures, and in an effort to implement essential changes, the company developed "Project Resolve."  "Project Resolve" is an ongoing process which involves aggressive reassessment and redesign of virtually every function at the Institute Site including everything from production processes to management structure.  Implementation of the essential elements of "Project Resolve" has resulted in the elimination of management "layers" and the development of empowered, self directed work teams. Deposition of Paul Davis (hereinafter Exhibit E) at pgs. 18 – 20, 79.

The work of various "design teams" associated with implementation of "Project Resolve" has been ongoing since late last year.  The work of these teams has already resulted in the elimination of management layers within the organization, and has also resulted in the "redesign" of virtually every component of the production, maintenance and administrative functions at Institute.  In the course of this effort, both the performance of each and every employee at the facility (as well as that of contractors operating within the industrial park) and the very processes by which work has historically been performed have come under close scrutiny.  It is not surprising, then, that Mr. Witcher and his peers (both black and white) believe their work has been increasingly scrutinized.  This process affects virtually every employee at the Institute site equally.  Exhibit E at 79 - 80.

Though this background may be helpful in understanding some of the basis for the Plaintiffs' perceptions, it is not this general focus on improving all aspects of plant operation which is at issue, however.  Rather, Witcher cites 2 instances in which he contends he was singled out for scrutiny.

The first relates to the installation and operation of an analyzer.  Exhibit C at 72 – 84.  In summary, Witcher had been been assigned to work with Mr. Al Hill on a project which would otherwise have been handled by contractors in the plant.  In the course of that project, Hill reported to Witcher that the time they were spending doing the work, as well as the costs being incurred, were being questioned by plant management.  Further, there were some start up problems with the equipment.  As a result of these and other factors, chemical operators responsible for production in the unit were upset.  Witcher admits he was never directly questioned about any aspect of the work and that his claim that the work was "unduly scrutinized" is based solely upon information reported to him by Al Hill and the fact the operators in the unit were upset.  Id.

The second event involved an investigation related to the "C100 Reactor."  On August 7, 2003, Mr. Alfred Hill[2] contacted Joyce Adkins in the company's Human Resources Department at the Institute Site, and presented her with a document which he contended documented that he was being singled out for unfair treatment and that his work had been "sabotaged." Deposition of Alfred Hill, taken on July 13, 2007 in *Alfred Hill v. Bayer CropScience, LP Civil Action No. 07-392, (Circuit Court of Kanawha County, W. Va.) Deposition of Alfred Hill (hereinafter Exhibit F) at 47 – 66; Hill Deposition Exhibits (hereinafter Exhibit G) at 9.*  At that time, neither Mr. Hill nor Mr. Witcher made any claim that they were being harassed due to their race, or that they had been the subject of discrimination.  Mr. Hill did not ask Ms. Adkins to take any action regarding the information he provided.  Rather, he simply wanted to document Ms. Adkins' files. Mr. Hill told Ms. Adkins there was an investigation going on in the unit and that he would contact her again after the investigation if there was still a problem.  Mr. Witcher has never contacted Ms. Adkins to lodge any complaint.

---

[2]  Hill has filed a separate suit in the Circuit Court of Kanawha County arising from these same facts.

The investigation concerned a "minor incident/release" which had occurred on June 6, 2003.  Exhibit G at 10.  In non-technical terms, the unit had experienced a continuing problem with a valve which controlled part of the production process in the unit.  The problem had resulted in production delays, and had involved pneumatic, electrical and mechanical issues.  Prior to the incident, Hill and Witcher had installed equipment related to the valve.  Thereafter material was inadvertently "dumped" when the valve failed to operate properly.  Since both Hill and Witcher were among the persons responsible for maintaining the valve, their work came under scrutiny.   During the investigation, Mr. Hill contended that the valve had been "sabotaged."   Based upon their investigation, Mr. Hill's managers confirmed none of the irregularities were attributable to Mr. Hill or Mr. Witcher.  Exhibit G at 10.

Those conducting the investigation ultimately identified several factors as having contributed to the failure of the valve to operate properly.  One of the factors cited was that certain air leads had been switched in an effort to operate the valve once it failed.  While the investigation was concluded in the sense that the cause of the malfunction was determined and corrected, the investigators were unable to conclude that any of the allegations of sabotage made by Mr. Hill, and repeated in the charge filed by Mr. Witcher, were supportable. Id.  While the report sets forth the investigators' conclusions regarding the malfunctioning valve, (and contains a handwritten note that no "sabotage" could be confirmed), the investigators did not pursue the allegations of sabotage further due to a lack of any evidence to support them.  Though all employees involved in the incident – black and white alike – came under scrutiny, no discipline was taken against any employee as a result of this incident.

Despite the fact he was never the subject of any allegation of wrongdoing, never had his work criticized and was never subjected to any disciplinary action as a result of the incident,

Witcher continued to claim the entire incident was racially motivated.    Exhibit D at 7.

Witcher also asserts that an e-mail forwarded by Supervisor Gary Darkens was racially defamatory.    The e-mail speaks for itself.    Even a cursory reading of the text shows that Darkens was simply informing the workforce that a new engineer had been added to the maintenance team in order to better deal with pieces of equipment which had a history of repeated maintenance problems.    Darkens referred to the equipment as "bad actors" – a term used throughout the chemical industry.    Exhibit D at 8.    No where in the e-mail did Darkens refer to any employee (other than identifying the new engineer and her role).    Nevertheless, Witcher perceived the term "bad actors" as referring not just to employees, but specifically to *black* employees.[3]    When Darkens became aware of the perception, he issued a follow-up clarifying his use of the term.    Exhibit D at 9.    Despite the fact Darkens never referred to any employee in a derogatory manner, and immediately addressed Witcher's concern when he learned of the misinterpretation, Witcher asserts the e-mail constituted racial harassment.

> ### b)    *Plaintiff Burns' claims.*
>
> #### 1.  *1978 to 2003 historical context.*

Burns' claims relate almost entirely to an ongoing friction between Burns and a co-worker named T.J. Hundley.    The conflict apparently began shortly after Burns was employed. Burns had been arrested as a result of beating a woman and was absent from work.    When he returned, Hundley began making derogatory comments to him.    The discussion became sufficiently heated that Mr. Paul Davis had to step between the two to prevent a fight.    Davis told Hundley to stop aggravating Burns, and Hundley responded he had "no use for a man who would beat a woman."    Exhibit E at 24 - 25.    There was no racial statement or connotation to this initial

---

[3]  In fact, Witcher has testified that most of the information upon which he based his perception came to him from other black employees, and that he was not personally present when the vast majority of the incidents which he cites occurred.

confrontation.  Further, when Davis reported the incident to Supervisor "Red" Bonham, Hundley was immediately and forcefully confronted and the conduct stopped.  Exhibit E at 29.  Simply stated, the confrontation which forms the foundation for the hard feelings between Burns and Hundley involved no racial comment, and was promptly and forcefully dealt with by management as soon as Hundley's conduct was reported.

Burns also contends that Hundley referred to him as a "N_____," and that in 1994 or 1995 he and Hundley (with other employees) were riding in a company van to a work location when Hundley began "whistling Dixie."[4]  Exhibit A at 30 – 35.  However, Burns never complained to the company about the incident.  Nevertheless, when the company human resources department "got wind" of the incident, an investigation was conducted in accord with the company's anti-discrimination policies.  Exhibit A at 26, 30 – 35.  As a result of the investigation Hundley received discipline.  Burns had been unaware of that fact until his deposition in this case.  Exhibit A at 34 - 35; Exhibit B at 4.  It is clear, therefore, than on each occasion when Burns or someone else reported any harassing conduct toward Burns, the Company took action.

> 2.  *2004 Oral Counseling incident.*

As part of the effort to avoid conflict between Hundley and Burns, the men had been assigned to work in separate areas of the plant.  As the workforce at Institute was "delayered" in connection with "Project Resolve" and number of hourly employees was reduced by more than half, it became more likely that the two would not be assigned to work together, and Burns vocally objected to having to work with Hundley.

---

[4] Even the most generous reading of the evidence shows the incidents to which Burns refers took place in the mid-1990s, far outside any applicable statute of limitations.  Further, a period of more than 10 years elapsed between Hundley's first confrontation with Burns and the "whistling Dixie" incident.

In approximately April 2004, Burns spoke privately with Supervisor Donnie Miller. Burns was visibly upset, speaking in a loud voice and agitated. He told Miller that he was not willing to work with Hundley, and if assigned to do so, he "could not be held responsible for his actions." Miller responded by telling him that all employees are responsible for their actions, and the conversation ended. Deposition of Donnie Miller, (hereinafter Exhibit H) at 16 – 23, 72.

On September 1, 2004, a regular meeting between supervision and Burns' work group was held. Part of the discussion related to the staffing of certain work. In the course of the discussion it became apparent that Burns might be assigned to work in a group with Hundley. As attendees were leaving the meeting, several supervisors including Donnie Miller were assembled at the front of the room. Burns approached the men and was again agitated and loud. Burns reiterated he was unwilling to work with Hundley and repeated the statement he had made months earlier to Mr. Miller – that if he was required to work with Hundley he "wouldn't be responsible for (his) actions." Exhibit H at 74. This statement was considered to be a violation of the company policy prohibiting threatening conduct or language. Exhibit B at pgs. 0002, 0011. Since other supervisors present (Robert Flenner and Gary Payton) were unaware of Miller's earlier conversation with Burns, Miller entered the discussion. Exhibit H at 28 - 30. He again reminded Burns that, like all employees, he would be held fully accountable for his conduct. The supervisors thereafter discussed Burn's comments and decided to issue Burns an "Oral Counseling."[5] Deposition Exhibit of Donnie Miller (hereinafter Exhibit I) at 1. The oral counseling was issued solely in an effort to impress upon Burns that he should not do something he would later regret, all in an effort to *assist Burns in avoiding a future problem*. Burns did not

---

[5] Under the Company's disciplinary procedures and "oral counseling" is not considered discipline.

receive any discipline as a result of his conduct, and has suffered no "adverse employment action" in connection with his statements.[6]

Upon receiving the oral counseling, Burns filed a grievance pursuant to the labor agreement. The grievance was processed in accord with the terms of the contract and eventually dropped by the union. See Exhibit J. (business record produced pursuant to FRCP 33(d).)

As a result of the issuance of the oral counseling, Burns also complained to Joyce Adkins in the company's Institute human resources department on September 9, 2004. See Exhibit K. (business record produced pursuant to FRCP 33(d).) Ms. Adkins conducted an investigation and then met with Mr. Burns together with Mike Crosier (union steward) and Tom Hudson (Institute human resources) at 2:00pm. At that meeting Ms. Adkins reviewed the results of the investigation, reaffirmed that the oral counseling was not discipline, reminded Burns that the type of statement he had made could be perceived as threatening and therefore a violation of company policy, and advised Burns it was his responsibility to make management aware of Hundley or any other co-worker did anything which was perceived by Burns as threatening or Harassing. See Exhibit K (business record disclosed to Plaintiff pursuant to FRCP 33(d).

### 3. 2004 discipline for failure to work overtime.

Burns received a written reprimand, discipline under the company's disciplinary procedures, as a result of his failure to report to do overtime work on Christmas eve day. Exhibit A at 6 – 8; Exhibit B, pg. 0001. Burns' testimony is that he was not scheduled to work overtime that day and that the discipline was therefore inappropriate. The discipline was issued, of course, because the company believed Burns *was* scheduled to work overtime that date and simply failed to appear. As permitted by the applicable labor agreement, Burns filed a grievance as a result of

---

[6] Burns has testified that he was indeed assigned to work along side Hundley shortly thereafter. The 2 worked "side-by-side" for approximately 2 weeks without incident.

the Written Reprimand.  Through the contractual grievance processes the Written Reprimand was reduced to an Oral Counseling, a penalty which is not considered discipline under the company's procedures.  Exhibit B at 3.

## ARGUMENT

a)      **Neither Plaintiff is able to present a prima facie case of discrimination.**

   *1.   Race discrimination claims.*

There can be no dispute that in order to prove a *prima facie* case of race discrimination or racial harassment, the Plaintiffs must show: 1) they are in a protected class, 2) they suffered adverse employment action and 3) they would not have suffered the adverse action "but for" their race.  *Dobson v. Eastern Associated Coal Corp.* 188 W. Va. 17, 422 S.E.2d 494 (1992); *See City of Ripley v. West Virginia Human Rights Commission,* 179 W. Va. 375, 369 S.E.2d. 226 (1988).  While it is clear both Witcher and Burns are members of a protected class, neither can offer any evidence supporting the other two elements of his claim.

To begin with, neither Witcher nor Burns has suffered any adverse employment action.  Witcher remains employed just as he has been for nearly 30 years.  He has suffered no loss of pay or benefits, has not been denied any position, and has suffered no disciplinary action.  Burns voluntarily elected to retire after nearly 30 years of service and is receiving full retirement benefits.

While Witcher alleges various instances of "discrimination," none of the events he describes constitute "adverse employment action" within the meaning of the law.  While he alleges that his work was scrutinized, that he believed others had sabotaged his work, and that employees who conducted an investigation into circumstances which surrounded the malfunction

of a valve in a production unit "covered up" the alleged sabotage, the fact remains Witcher was never so much as accused of having caused the incident.  He never received any discipline as a result of the malfunction.  He never suffered any penalty.

> 2.    *Hostile work environment claims.*

While both Plaintiffs allege they were subjected to a racially hostile environment, each cites very limited facts in support of such claims.   The only events Witcher cites as discriminatory in addition to the C100 Reactor investigation described above and the e-mail sent by Gary Darkens, is that he has not yet been trained regarding a particular computer system to be used in the unit and it was reported to him by Mr. Hill that their work of installing an analyzer was carefully scrutinized regarding the time it took to do the work and the associated costs.

Plaintiff Burns' claims are even more attenuated.  To begin with, Burns has elected to retire, and while working he suffered no adverse employment action with the exception of a single "oral counseling" issued to him as a result of a verbal exchange with his supervisors in which he stated he "would not be responsible for (his)…actions" if assigned to work with Mr. Hundley.  All the company did in response was to counsel Burns that all employees are held responsible for their conduct, and he should expect to be accountable.  That counseling was reduced to writing in order to document the file, but was never considered "discipline" under either the company's disciplinary procedures or the applicable collective bargaining agreement. Burns filed a grievance challenging the counseling pursuant to the provisions of the labor agreement.  That grievance was eventually dropped by his Union.  He also complained to the company human resources department.  After a thorough review of the circumstances, Burns was given a report of the inquiry, reminded he had not suffered any discipline and advised he should both avoid making statements which could be taken as threatening and report any misconduct by

Hundley to the company.  Like Witcher, Burns never suffered any loss of pay, benefits or entitlements.

While both Plaintiffs also contend these events constituted evidence of a  "hostile environment," neither can present any evidence that the "hostility" they claim existed was racially motivated.  Rather, they report only personal perceptions which are at odds with uncontroverted facts.

Witcher claims that based upon discussions with Al Hill he believes someone "sabotaged" his work, that an investigation constituted a "cover up" and that an e-mail which is clearly racially neutral somehow was racially derogatory.

Burns simply contends that over a period of nearly 30 years he had perhaps 2 or 3 incidents involving a single co-worker (T.J. Hundley) which he feels were racially charged.  The record is clear that as soon as each of these incidents was reported, the company took appropriate action.  When Burns announced to management that he "would not be held responsible for (his) actions" if required to work with Hundley, (despite the fact there had been no apparent conflict between the two for nearly 10 years) the company simply reminded him that ***all employees*** would be held accountable for their conduct.  Burns then worked with Hundley for approximately 2 weeks without incident.  Burns also received a disciplinary warning for failure to work overtime as scheduled.  When he filed and prosecuted a grievance under the labor agreement, the discipline was reduced to a non-disciplinary oral counseling.

The law is clear that these few incidents occurring over a period of nearly 30 years could not be sufficiently "severe or pervasive" to constitute a racially hostile work environment.  In order to form the basis for any "hostile environment" claim, the Plaintiffs' would have to demonstrate that they were subjected to racial harassment "so severe or pervasive as to alter the

conditions of (their)…employment and create an abusive working environment…" *Meritor Savings Bank, FSB v. Vinson* 477 U.S. 57, 106 S. Ct. 2399, 91 L.Ed.2d 49 (1986) (decided in the context of sexual harassment).   "Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter the terms and conditions of employment to violate Title VII." *Rogers v. EEOC* 454 F.2d 234 (C.A.5 1971), cert. denied, 406 U.S. 957, 92 S. Ct. 2058, 32 L.Ed.2d 343 (1972); *See Firefighters Institute for Racial Equality v. St. Louis* 549 F.2d. 506 (C.A.8) cert. denied *sub nom. Banta v. United States,* 434 U.S. 819, 98 S. Ct. 60, 54 L.Ed.2d 76 (1977).   The incidents constituting harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (C.A.2 1987).   The controlling cases teach that a racially hostile environment may only be said to exist where an examination of all the circumstances demonstrates that the racially hostile conduct has been frequent, severe, involves and threatening or humiliating conduct which unreasonably interferes with the plaintiff's work performance.   Simply stated "the conduct must be extreme in order to amount to a change in the terms and conditions of employment."  *See Farragher v. City of Boca Raton,* 524 U.S. 775, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998), at 788 citing *Carrero v. New York City Housing Auth.* 890 F.2d 569, 577-578 (C.A. 2, 1989).   "When the workplace is permeated with 'discriminatory intimidation ridicule, and insult'… that is 'sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment…Title VII is violated." *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993), citing *Los Angeles Dept. of Water and Power v. Manhart* 435 U.S. 702, 98 S. Ct. 1370, 55 L.Ed.2d 657 (1978).

Neither Plaintiff can present sufficient evidence to make out a viable claim under this standard.  Burns cites 3 or 4 events over a period of nearly 30 years;  Witcher cites 2 or 3. Neither Plaintiff suffered any change in the terms and conditions of their employment.  Under these circumstances it cannot be said that the conduct charged comes close to rising to the level of  "extreme."  As such, neither Plaintiff can provide evidence sufficient to meet their burden.

b)      ***Plaintiffs' claims are barred by their  failures to exhaust available internal remedies.***

The Company has a long-standing policy prohibiting discrimination.  All that is required is for the employee to report an incident to the Company human resources department and request an investigation. Further, bargaining unit employees like Witcher and Burns are protected by nondiscrimination language in their collective bargaining agreement, and may file a grievance if they believe that provision has been violated.  Any such grievance would be submitted to binding arbitration by a neutral arbitrator if it were not resolved during the grievance process.

Paul Davis reported an initial incident to supervisor "Red" Bonham in Burns behalf shortly after Burns was employed.  Bonham responded by immediately and forcefully telling T.J. Hundley to stop his behavior.  The incident did not involve racial comments. Exhibit E at 29. Burns reported a second incident involving Hundley approximately 10 years later, and the company human resources representatives investigated.  Based upon the investigation, Hundley was issued discipline.  Exhibit B at 4.  Clearly, Burns was well aware of the availability of an internal procedure, used it, and the company took immediate, effective and appropriate action.

Discovery in this case has revealed that over the same time period during which the Plaintiffs claim they was being subjected to discrimination or harassment, Company human resource representatives received, investigated and resolved no fewer than 60 internal complaints

of one type or another.  There is no evidence that any complaint made to the department was ever ignored.  To the contrary, the business records produced by the Defendant at the request of plaintiffs' counsel show that detailed investigations were conducted where appropriate, and disciplinary action was taken against persons found to have violated the policy.  Even where no specific individual could be identified as having engaged in conduct violating the policy, the Company took general steps to reinforce the policy.  There is no evidence – nor could there be – that the Company failed to accept, investigate and resolve discrimination complaints.

While an employer may be held vicariously liable for an "actionable hostile environment…"[7], it may also defend such claims by asserting an affirmative defense where the employee has "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Farragher v. City of Boca Raton, Supra, at 807.*  Where the employee is aware that he or she has available a mechanism for addressing current discriminatory conduct and preventing such conduct in the future, the employee has an obligation to "take advantage" of that process.  Failure to do so bars his or her claim.  *Farragher v. City of Boca Raton, supra.*  Further, where the employee has suffered no "tangible employment action," the employer may assert an affirmative defense that the employer 1) exercised reasonable care to prevent and correct promptly any harassing behavior and 2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Id.; Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

---

[7] In this case there is no evidence supporting any finding that any supervisor created an "actionable hostile environment," since the "hostile environment" is attributable to the perceived attitudes of the Plaintiffs' co-workers.

Clearly, Bayer CropScience LP had in place an effective program for preventing all types of harassment, and where not prevented, investigating complaints and taking appropriate disciplinary actions to prevent recurrence.  The employer in this case took reasonable steps to prevent and address hostile work environment claims.  Despite the fact these Plaintiffs each had an effective mechanism available to resolve any complaints they may have had, they failed to complain about any incident not discussed in detail above.  In so doing, they deprived the Company of the ability to resolve or prevent exactly the incidents and circumstances they now claim were discriminatory.  Their failure to present their complaints to the Company  bars their prosecution of those complaints before this Court.  In the language of the controlling decisions, they have "failed to reasonably stave off avoidable harm."  *Suders, supra at. 2345.*

Were the existence of a viable procedure for addressing the alleged discriminatory conduct under the company's nondiscrimination policy not enough, both Plaintiffs had an available and potent remedy under the collective bargaining agreement.  The very language of the contract echoes the Company policy prohibiting discrimination.  Exhibit G at 6.  The contract further provides an effective dispute resolution procedure which culminates in binding arbitration.  Throughout his employment Witcher had a right to file a grievance alleging he had been the subject of discrimination, have that grievance investigated by his union, and have the grievance heard by an independent arbitrator if it were not resolved through the grievance process.  Exhibit B at 7.

Witcher never filed such a grievance.  Burns filed a single grievance related to the oral counseling he received in 2004.  That grievance was properly processed under the contractual procedures and the matter laid to rest.  Burns' claims related to the 2004 oral counseling have been presented for resolution under the contractual grievance procedure and the issue has been

disposed of.  The resolution of that grievance is a matter of res judicata or collateral estopple which bars further prosecution of the same matters before this Court.

The Plaintiffs' respective failures to initiate and exhaust available contractual remedies should bar their claims.

c)  ___Plaintiffs' claims are barred by the applicable statutes of limitation.___

It is clear that the maximum statute of limitations period for any claim asserted in this case would be 2 years prior to the filing of each Plaintiff's charge with EEOC.  Any claim not asserted within 180 days of the event giving rise to it is barred under Title VII. 42 U.S.C. 2000e-5(e).  Only under the West Virginia Human Rights Act would the applicable limitations period be 2 years.  W. Va. Code Sec. 5-11-13 (_____); *Cooper v. Norfolk & Western Ry. Co.* 870 F.Supp. 1410 (1994)  Each Plaintiff filed their charge with EEOC on July 25, 2005.[8]  Under either applicable statute, "…the charging (limitation) period is triggered when a discrete unlawful practice takes place. …(I)f an employer engages in a series of separately actionable intentionally discriminatory acts, then a fresh violation takes place when each act is committed. …(C)urrent effects alone cannot breathe life into prior, uncharged discrimination."  *Ledbetter v. Goodyear Tire & Rubber Company, Inc.,* 127 S.Ct. 2162, 2164, 167 L.Ed.2d 982 (2007).  Both Witcher and Burns base their claims of "racial harassment" upon a series of distinct, identifiable events occurring over a period of nearly 30 years.  Each of those events constituted a separate, actionable act which was required to be charged within the statutory period if it was to be preserved.  The only "charged events" are those incorporated into the Plaintiffs' respective charges filed with the Equal Employment Opportunity Commission in July, 2005.  Therefore, no act or incident which occurred prior to July 25, 2003 can form the basis for any claim in this action.

---

[8]  Though the charge form bears a date of August 11, 2005, Burns signed the charge on July 25.

### 1.      Burns' claims

Within the 2 years prior to the filing of the charge, only a single incident is claimed by Burns to have been discriminatory.  He contends that in 2004 he was improperly given discipline when he made it known he did not wish to work with a fellow named T. J. Hundley and "could not be held responsible for (his) actions" if assigned to work with Hundley.

As stated above, the friction in the relationship between Burns and Hundley began sometime in the late 1970s or early 1980s when Hundley badgered Burns after Burns had been released from jail.  No racial comment was made at that time, and the dispute centered around the fact Burns had assaulted a woman.  Clearly, that incident can not form the basis for any claim.

The only other incident identified by Burns as having occurred between he and Hundley was documented in 1994.  Burns complained to the Company human resources department (as he should have done) that Hundley had "whistled Dixie" while the two were riding in a van with some co-workers.  Burns perceived Hundley's act as racial harassment.  Upon investigation, the Company issued discipline to Hundley and documented his file.  Exhibit B at 4.  That incident cannot form the basis for any claim in this case since it is more than 10 years outside the limitations period.  Further, it was dealt with promptly by the Company, and no other incident is cited by Burns until 2004.

Neither of these incidents is any longer actionable.  Together they represent 2 incidents – only one of which was racially charged – over a period of 20 years.  The only claims which remain procedurally viable are the incidents in which Burns received  "oral counselings" in 2004 – one for his statements at the meeting in September and the other for failing to report for overtime work in December.  Neither "counseling" constituted discipline under the Company's

disciplinary policies.  The September counseling was issued to Burns solely in an attempt to confirm to him that he – just like any other employee -  *would* be held responsible for his actions. He suffered no penalty as a result of his behavior.  The second was issued when he failed to report for overtime work.  Though initially issued as a Written Reprimand, it was reduced to an oral counseling when Burns filed a grievance.  Finally, there is no evidence – nor could there be – that the issuance of  either counseling was racially motivated.[9]

Simply stated, there is no actionable event or incident involving Burns within the statutory limitation period.

### 2)  *Witcher's Claims.*

Witcher filed his charge with EEOC on July 27, 2005   As with Burns, none of the incidents to which Witcher alludes remain actionable, with the exception of his claim that he was the subject of discrimination through the investigation into the C100 Reactor incident, and his claim that Darkens' e-mail was racially hostile.

As stated above, the investigation related to the C100 Reactor incident resulted in no action being taken against Witcher or any other employee.   While Witcher perceives the investigation to have been inadequate and he asserts it was a "cover up," the fact remains he suffered no adverse consequence as a result of the inquiry.  The claim is simply not actionable.

The Darkens e-mail lies in the same category.  Despite Witcher's vocal assertions that the e-mail is racially derogatory, it contains not a single reference to any employee other than a new engineer who had been brought on board in order to help resolve existing maintenance issues. There is no dispute the maintenance problems existed, and there is no dispute the purpose of the

---

[9]  While Burns might argue that Hundley was not issued counseling, and therefore he was treated more favorably than Burns, it is important to remember that since receiving discipline in 1994 as a result of "whistling Dixie" in Burns' presence, Hundley had not committed any further infraction.  Further, Hundley never made any statement similar to Burns.  Since Burns was the only one to state he "wouldn't be held responsible for (his) actions," he was the only one to receive the counseling.

e-mail was to let those involved know how Mr. Darkens intended to approach resolving them. There is no racial comment, no criticism of any employee and nothing which would lead a reasonable person to conclude the e-mail was intended to target any group of employees. Witcher can prove no claim based upon this communication.

Even if he could somehow relate the e-mail to some discriminatory conduct, it is undisputed Darkens clarified his remarks when he learned Witcher and others had misperceived his statements.  Nothing in this exchange is actionable.

In summary, no event described by either Burns or Witcher as occurring within the 2 year statutory limitation period is actionable.  Any claim based in whole or in part upon any event or incident occurring prior to July 25, 2003 is barred.

**d)**     **_All claims other than those asserted in Burns and Witcher's EEOC charges are barred._**

The assertion of claims before EEOC is a jurisdictional prerequisite to bringing an action in this Court.  Likewise, the scope of this Court's jurisdiction is limited to the parties and claims before EEOC.  Stated differently, any claim not presented by Burns and Witcher to EEOC for investigation has been waived and this Court lacks jurisdiction over them.

Burns' charge before the agency identifies only a single substantive event within the statute of limitations period which he contends is discriminatory; the issuance of the "oral counseling" to him after he stated to supervision that he "would not be responsible for (his) actions" if assigned to work with T. J. Hundley.  Therefore, _only this incident can form the basis for any claim by Burns._

Witcher's charge before the agency is similar in scope.  In it, he points to only 2 incidents which he contends constitute racial discrimination; the investigation arising from the C100

Reactor incident and the e-mail in which Mr. Darkens refers to "bad actors."   As discussed above, neither of these events display any racial component.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment is a device "'designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial,' if, in essence, there is no real dispute as to salient facts or if only a question of law is involved."   *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755, 758 n. 5 (1994) (quoting *Oakes v. Monongahela Power Co.,* 158 W. Va. 18, 207 S.E.2d 191 (1974)).   *See also*, *Hanks v. Beckley Newspapers Corp.,* 153 W. Va. 834, 172 S.E.2d 816 (1970).   As such, a motion for summary judgment should be granted when it is clear that there is no genuine issue of material fact to be tried and that inquiry concerning the facts is not desirable to clarify the application of the law.   Syl. pt. 3, *Aetna Casualty and Surety Co. v. Federal Insurance Co. of N.Y.,* 148 W. Va. 160, 133 S.E.2d 770 (1963).   *See also,* Syl. pt. 2, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994); Syl. pt. 1*, Andrick v. Town of Buckhannon*, 187 W. Va. 706, 421 S.E.2d 247 (1992).

In this case, summary judgment is appropriate.   No incident occurring within the statutory limitations period and reported to EEOC by either Burns or Witcher as the basis for their claims involved any racial statement or racial slander.   Neither employee was singled out for discipline or other adverse employment action.   While Witcher perceives both the investigation related to the C100 reactor incident and the e-mail sent by Mr. Darkens to have been "discriminatory," there is no evidence to support his personal belief.   Neither Plaintiff invoked or exhausted available effective internal complaint procedures or contractual remedies.   Neither of the Plaintiffs suffered any economic loss.   Under the circumstances of this case

summary judgment is appropriate and the Defendant's Motion for Summary Judgment should be

granted.

**BAYER CROPSCIENCE LP**
By Counsel

/s/Joseph M. Price (#2981)
David S. Russo (#5087)
Robinson & McElwee PLLC
P.O. Box 1791
400 Fifth Third Center
700 Virginia Street East
Charleston, WV 25326
(304)-344-5800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

KEVIN E. WITCHER and
BOBBY BURNS

     Plaintiffs

                                        Civil Action No. 2:06-cv-00947

vs.

BAYER CROPSCIENCE LP,
Its agents, employees, and those
Acting in concert with Defendants,

     Defendant.

### ***CERTIFICATE OF SERVICE***

     I, Joseph M. Price, Counsel for Bayer CropScience LP, do hereby certify that on the 3rd

day of January, 2008, I electronically filed the foregoing **BAYER CROPSCIENCE LP**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the

Clerk of this Court using the CM/ECF system which will send notification of such filing to all

counsel of record and that there are no non-CM/ECF participants in this matter.

                           Eunice L. Green, Esq.
                           P. O. Box 893
                           Dunbar, WV 25064

/s/Joseph M. Price (#2981)
David S. Russo (#5087)
Robinson & McElwee PLLC
P.O. Box 1791
400 Fifth Third Center
700 Virginia Street East
Charleston, WV 25326
(304)-344-5800
Counsel for Defendants